BASIC IRON ORE COMPANY, respondent,

v.

JOHN H. DAHLKE, appellant.

[Decided October 20th, 1930.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

"Complainant's bill is to restrain defendant from the threatened forfeiture of complainant's rights as lessee of mining rights for iron ore on defendant's premises in Warren county; and for a judicial accounting between the parties—tendering payment of any amount found due.

"The case turns on the determination of the true interpretation of the terms of the mining lease held by complainant. Defendant leased the mining rights to one Ahles in 1901 for a term of twenty years, and again in 1903 for a further term of twenty years; the provisions of the two leases being substantially similar. In 1904 complainant took the place of Ahles, by assignment from him. In 1912 by due agreement between complainant and defendant the rate of royalty in the leases was modified.

"The two paragraphs of the lease which are particularly pertinent to the present consideration (as modified by the later agreement changing the royalty rate), are substantially as follows (designated 'A' and 'B' for convenience) :

" 'A. In consideration whereof the said lessee agrees to pay to the lessor for every ton of twenty-two hundred and forty pounds in weight of merchantable iron ore raised, mined and taken away from the said premises the sum of twelve and one-half cents on washed · iron ore, and on all unwashed iron ores shipped and used ten cents per ton, said royalties to be paid quarterly on the first day of April, July, October and January of each year for the quarter immediately preceding. The weights of ores to be ascertained from scales of railroad companies transporting the ore, and if not shipped by railroad

to be ascertained in any other reasonable manner; the lessee to furnish statement of ores shipped, to whom shipped and when shipped, and the prices and values thereof with payments of royalties, lessor to have the right at all reasonable hours to inspect the books or book in which weights and prices of ores are kept and to take statements therefrom.

" 'B. It is further agreed that the lessee shall each and every year during the term of this lease and agreement pay unto the lessor the sum of four hundred dollars, to be paid in quarterly payments of one hundred dollars each quarter on the quarterly dates specified, which sum shall be credited against royalties on iron ore subsequently mined. In case of failure to pay such quarterly payments or royalties within twenty days after they are due and written demand has been made for the same, then in that case this lease shall be null and void, at the option of the lessor, and the lessor, his heirs and assigns may enter.'

"Complainant, prior to September 1st, 1914, mined and brought to the surface more ore than it shipped, and thus accumulated a large bank of ore on the surface. Since September 1st, 1914, it has brought no ore to the surface; all of its subsequent shipments have been of ore from the bank theretofore accumulated.

"From the middle of 1914 to the middle of 1919, complainant shipped practically no ore (because it could find no customers). From January 1st, 1915, to April 1st, 1923, inclusive, it paid the minimum quarterly payments, but no royalties calculated on ore shipped, because during that period the royalties due for ore shipped did not amount to the sum of the minimum quarterly payments required by the lease.

"Subsequently the amount of royalty computed on ore shipped (hereinafter called the 'earned royalty') has exceeded the minimum quarterly payment. Complainant claims the right to credit the minimum quarterly payments previously made, against the earned royalties subsequently accruing. Defendant denies that complainant has such right, because the earned royalties have accrued only from shipments of ore which was brought to the surface prior to September 1st, 1914; he contends that under the terms of the lease providing for the crediting of the minimum payments 'against royalties on iron ore subsequently mined,' the minimum payments can be credited by complainant only against royalties accruing in re-

spect of ore brought to the surface subsequent to the making of such minimum payments.

"Complainant has made payments or tenders of earned royalties computed according to his contention. Defendant, claiming that these are less than he is entitled to under the lease, has demanded additional payments, and has threatened that if they be not made he will exercise a right claimed by him under the lease to declare the lease null and void.

"It seems clear that complainant is entitled to permanent injunction against the threatened forfeiture; first because defendant has no right under the lease to such forfeiture, and secondly, because assuming that he ever had such a right, he has waived it; thirdly, because complainant is not in default.

"The alleged right to declare a forfeiture rests on the second quoted paragraph of the lease, wherein it is conditioned upon failure of the lessee 'to pay such quarterly payments or royalties within twenty days,' &c. The subject-matter of this paragraph is the requirement that the lessee pay a minimum rental or compensation, quarterly, even though no ore be mined and shipped. The subject-matter of the preceding paragraph ('A') is the requirement that the lessee pay a rental or royalty per ton on all ore taken away. The clause as to forfeiture is not a separate paragraph, but is a part of paragraph 'B,' which tends to indicate that the right to forfeiture is only for default in the minimum quarterly payments. It is true that the royalties on the ore mined are referred to earlier in that paragraph, and that the clause in question says 'such quarterly payments or royalties,' but it is also clear that the word 'royalties' may be construed as being an alternative designation of the 'quarterly payments' equally as well as it may be construed as referring to the royalties on mined ore. That it should be interpreted as a mere alternative designation of the 'quarterly payments' is supported by the fact that in each of the receipts given by defendant and accepted by complainant, for all these $100 quarterly payments down to the time that controversy first arose between them in 1923, such payments are designated payments of 'minimum royalty.'

"Considering the respective main subject-matter of the two paragraphs, and the rule that construction is to be made against, rather than in favor of, a forfeiture, and the further rules that construction is to be made against, rather than in favor of, the lessor and the draftsman, it is concluded that the lease does not give the lessor the right to forfeit for failure to pay the earned royalties on ore mined. There is no contention that there has been any default in payment of the minimum quarterly payments.

"Furthermore, if any such right to declare a forfeiture had existed in favor of defendant, it was waived by him. In an arbitration agreement made two or three years before the commencement of this suit, defendant, together with complainant, submitted to arbitrators the determination of a controversy between them as to the amount at that time due from complainant to defendant (or *vice versa*), involving the very same question as to whether or not complainant was entitled to credit minimum royalties against earned royalties thereafter accruing on shipments of ore brought to the surface before September 1st, 1914; and agreed that in their future dealings they should be bound by the principles involved in the findings of the arbitrators.

"It would seem that this impliedly constitutes a waiver of any right defendant might otherwise have claimed, to penalize complainant for alleged default in payments by forfeiture of the leasehold rights—at least unless, and until, the arbitrators should find in favor of defendant.

"In the third place, there has been no default by complainant. Concededly the question as to whether there was or was not such default, rests solely upon the determination of the true interpretation of the lease. If complainant has the right, under the lease, to credit minimum quarterly payments against earned royalties subsequently accruing on shipments of ore raised to the surface prior to the making of the minimum payments, then complainant is not in default. To hold that complainant had not that right, it would be necessary to ascribe to the word 'mined' [in the quoted paragraph 'B'], an extremely limited and special meaning; and

for this no justification can be found either in the lease itself, or the surrounding circumstances, or the subsequent acts of the parties.

"Defendant contends that 'mined' means 'dug and taken from the earth;' that the ore already in bank on the surface previous to the time of the quarterly payment, had then already been 'mined' and was not ore 'subsequently mined;' and that the parties intended by the lease that complainant could credit against the quarterly payments royalties only on ore 'dug and taken from the ground' *subsequent* to the quarterly payments.

"There is nothing whatever to indicate that the parties, or either of them, ever had any such intention. On the contrary, consideration of the whole lease, and all the attendant circumstances, makes it clear that the clause 'royalties on iron ore subsequently mined' is to be interpreted as if it read 'royalties subsequently accruing due on iron ore.'

"In a mining lease the lessor's compensation fulfills a two-fold character—(1) rent, or interest on his capital invested in the ownership of the tract; and (2) royalty, or payment for the ore taken out of and away from his ground. If the lease provided for compensation to the lessor solely by a royalty on the ore, then unless there were a covenant by the lessee to mine and pay royalty on at least a minimum fixed amount, the lessee might refrain from mining and thus deprive the lessor of any compensation whatever, at the same time depriving the lessor of the right to mine for himself.

"In the present lease, instead of a covenant to mine a certain minimum amount, there is the covenant to pay the minimum quarterly payment of $100 each quarter. This was a fair provision to protect the lessor. In order to make it fair for the lessee as well, and to make it substantially as beneficial to the lessee as a covenant to mine a minimum quantity, the clause providing that the minimum quarterly payments should be credited on subsequent royalties, was inserted.

"There was no reason in the nature of things nor in the circumstances of the parties why this credit should not be

allowed on all subsequent royalties earned—no reason why it should be limited to royalties on ore *subsequently taken from the earth.* The defendant has been unable to suggest any such reason: at any rate none has been suggested by him. There was of course an obvious reason for limiting the crediting to royalties *subsequently accruing* (instead of allowing it as well on royalties *previously* paid)—but there was no reason for such meticulous refinement of limitation as allowing it only on royalties subsequently accruing on ore subsequently taken from the ground.

"The thing which was important to the lessor was not to secure at least a minimum amount of operation by the lessee; but to secure at least a minimum constant income; the thing which was important to the lessee was to avoid, as far as possible, having to pay the minimum yearly payments without itself deriving any benefit.

"It seems fairly obvious that neither party contemplated the contingency which has now arisen. The natural and normal course of mining would be for the mining, concentrating, and shipping to be carried along contemporaneously, and at approximately the same rate. Any considerable accumulation of ore on the surface would not be contemplated by either party. It would do the lessee harm rather than good—for it could not get back any of the cost of mining until it sold and shipped; it would do the lessor good rather than harm—for any ore raised to the surface and not shipped prior to the expiration of the lease, would inure entirely to his benefit without expense, and in the meantime the minimum quarterly payment assured him a constant income.

"The provisions in this lease reflect precisely the circumstances of the parties and the intentions naturally to be expected under those circumstances. The lessor's compensation is fixed primarily on a sale basis—a royalty per ton on ore taken away—with a 'rent' or minimum yearly payment provision for protection in case the lessee did not operate. The royalty is payable only when the ore is removed from the lessor's lands—(on the ore 'raised, mined and *taken away* from said premises,' and on the ore *'shipped* and used')—

until it was removed from the premises it would still remain the lessor's, with the added benefit of whatever work had been done on it.by the lessee.

"Not only does the general situation disclosed by the lease and the attendant circumstances tend to refute defendant's contention—there are specific provisions and indications in the lease which disprove his claim.

"That ore was not 'mined' when it had been raised to the surface is shown by the words in the preceding quoted paragraph ('A'), 'iron ore raised, mined and taken away,'—indicating clearly that it was to be 'mined' *after* it was 'raised.' Again, the lease provides no means for ascertaining the amount or tonnage of ore 'mined' or 'raised' to the surface'— as would be expected if this operation were in anywise material under any provision of the lease. The provision is only for ascertaining the weight of ore 'shipped;' the same is true as to the provision for lessee's furnishing statements of ores 'shipped'—not for ore 'mined' or 'raised.'

"The rules as to construction most strongly against the lessor and the draftsman also would operate against defendant; although it seems unnecessary in this case to call them into operation.

"For these reasons it is concluded that complainant had, and has, the right under the lease to credit the minimum quarterly payments upon royalties accruing due on subsequent shipments of ore, whether such ore was raised from the ground before or after the making of the quarterly payments.

"Moreover, there is a further cogent reason for this determination; namely, the construction by defendant himself, as evidenced by his own admissions. The evidence shows that from January 1st, 1915, down to October 1st, 1917, the lessee shipped no ore, but made the minimum quarterly payments aggregating $1,200. In the quarter October 1st, 1917, to January 1st, 1918, it shipped ore which was raised from the ground before 1915, and on which the royalties would have amounted to about $345, but made no payment of tonnage royalty, obviously because it had the $1,200 credit of the minimum quarterly payments. The same thing hap-

pened in six or seven other quarters in 1919, 1920 and 1921—the lessee shipped, in each of said quarters, ore raised from the ground before 1915, on which the tonnage royalty would have exceeded the $100 minimum quarterly payment, but made no payment of any tonnage royalty because of the aggregate amount of minimum quarterly payments standing to its credit. This was no accident—eight different occasions covering four years. The defendant accepted simply the minimum quarterly payments, and made no demand for additional payments because of tonnage royalty. He acquiesced in the construction now contended for by complainant; he made no contention for the construction now argued by him. More than that he made the specific admission, in the arbitration agreement, on February 6th, 1924, that all payments due under the lease 'have been paid in full to the said John H. Dahlke to the 1st day of April, 1923;' and still further, he makes a similar specific admission in his own answer (drawn by himself), in the present suit.

"If the parties cannot agree upon an accounting upon the basis herein determined, it may be referred to a master to state such account, and the decree will, of course, provide for the payment of such balance as may be found due from either party to the other."

*Mr. Edgar W. Hunt,* for the respondent.

*Mr. John H. Dahlke,* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Buchanan.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, DEAR, WELLS, JJ. 14.

*For reversal*—None.