18 N.J. Super. 259 (1952)
87 A.2d 37
ISABELLA BURNSTINE, PLAINTIFF-APPELLANT,
v.
MORRIS MARGULIES, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 25, 1952.
Decided March 12, 1952.
*264 Before Judges JACOBS, EASTWOOD and BIGELOW.
Mr. Norman Heine argued the cause for the appellant (Messrs. Heine and Heine, attorneys).
Mr. Samuel P. Orlando argued the cause for the respondent (Messrs. Orlando, Devine & Tomlin, attorneys; Mr. Joseph Rappaport, of counsel).
The opinion of the court was delivered by BIGELOW, J.A.D.
This action grows from a fire that occurred in the evening of September 19, 1949, and, according to the complaint, "destroyed a substantial part" of a store building in the city of Camden, which was leased by the plaintiff-appellant as landlord to the defendant-respondent as tenant. A dispute arose between the parties; the building was not repaired; the tenant ceased to pay rent; a summary judgment for possession was obtained by the landlord February 1, 1950, and she sold the property, the building still unrestored September, 1950.
The landlord sues for rent to the time she sold the premises, together with taxes that the tenant had covenanted to pay. The tenant defends on the ground that the landlord was under a duty to restore the premises, and that her failure to do so deprived the tenant of the use of the premises *265 and amounted to a constructive eviction. The tenant also counterclaims for $1,000 which he had deposited with the landlord as security, and for part of the proceeds of fire insurance which had been procured at the tenant's expense and collected by the landlord. The jury returned a verdict of no cause of action on the complaint, and a verdict for the tenant in the sum of $1,000 on the counterclaim. Judgment was entered accordingly. On the appeal the landlord argues only that the trial judge should have directed a verdict in her favor on her complaint and also on the tenant's counterclaim, and that the court erred in one passage of the charge to the jury.
The lease, made in 1946 for a term of ten years, is a very long instrument and like so many documents that are overly elaborate, its meaning in many respects is obscure. The construction of the lease is a matter of law to be determined by the court. Smalley v. Hendrickson, 29 N.J.L. 371 (Sup. Ct. 1862); Whittle v. Associated Indemnity Co., 130 N.J.L. 576 (E. & A. 1943). Since the draftsman was the landlord's attorney, the construction of the lease should tend to favor the tenant rather than the landlord. Basic Iron Ore Co. v. Dahlke, 108 N.J. Eq. 68 (E. & A. 1930). "A construction which makes the contract fair and reasonable will be preferred to one which leads to harsh or unreasonable results." Williston on Contracts, § 620.
Article 5 of the lease contains detailed provisions effective in the case of fire: there shall be no abatement or reduction of rent; the tenant will not quit or surrender possession; he will repair and rebuild at his own expense "except as hereinafter provided for the application of insurance moneys"; if the cost of restoration as estimated by the contractor exceeds $2,500, the tenant will give to the landlord a completion bond for the excess of the cost as so estimated over and above the insurance moneys; the tenant will promptly commence and diligently prosecute the work of restoration in accordance with plans and specifications first approved by the landlord.
*266 Another article of the lease provided that the tenant should, at his own expense, keep the demised building insured against loss by fire at the full cost of replacing the building, less a reasonable amount for depreciation. Disposition of the insurance money is directed by Article 5: it shall be payable to the landlord as trustee and shall be deposited by her in the Camden Trust Company "as a trust fund for the benefit of the landlord and tenant." The fund shall be applied to the cost of restoration of the building as the work proceeds. Application of the fund shall be made pursuant to certificates of the architect certifying the cost of the work done to date, but 15 per cent of the amount shown in each certificate shall be paid by the tenant without recourse to the insurance fund. When the restoration is fully completed, the cumulated 15 per cent shall be paid to the tenant. If the insurance moneys are insufficient to pay the entire cost of restoration, the tenant shall pay the deficit. "After such restoration, rebuilding or replacement shall have been completed and paid for, as aforesaid, the balance of such insurance moneys shall be paid to the tenant and if the tenant shall make default in such restoration, rebuilding or replacement, all of such insurance moneys shall be paid to the landlord. In case of the termination of this lease by reason of a default by the tenant, all funds so deposited and not then applied shall be paid to the landlord for her own use."
Then comes this important provision: "The landlord may, at her option, restore, rebuild or replace said building or the part thereof destroyed by fire and in the event that the landlord so elects" to do so, "and the insurance moneys received are insufficient therefor, the tenant shall remain liable for and pay such excess cost to the landlord."
Let us now take up the course of events. The fire occurred, as we have mentioned, September 19, 1949. Within 24 hours, Mr. Marks, a New York lawyer who, throughout this matter, acted for Mrs. Burnstine, the landlord, was informed of the fire and went to Camden to acquaint himself with the situation. On October 6, Margulies, the tenant, with his *267 attorney, called on Marks. "I believe," testified Marks, "he even asked me whether Mrs. Burnstine would permit Mr. Margulies to rebuild." Marks replied that he would take up the question with the Burnstine family. On October 20, a month after the fire, the landlord, having agreed with the insurance company on the settlement of the fire loss, elected to restore the damaged building herself. However, as it turned out, she never even began the work of repair and rebuilding.
Immediately upon the landlord's election to restore, and notification thereof to the tenant, the landlord became obligated to the tenant by an implied covenant to restore. Such an obligation need not be expressly stated but may be raised by words in the lease indicating with reasonable clarity that this was the intention of the parties. Cannock v. Jones, 3 Ex. 233; 154 Eng. R. 829; 5 Ex. 713; 155 Eng. R. 312, affirmed 3 H.L. Cas. 700; 10 Eng. R. 278; 15 Eng. Rul. C. 679; Broad, etc., Corp. v. J.J. Hockenjos Co., 132 N.J.L. 229, 235 (Sup. Ct. 1944). The lease before us exhibits a clear purpose that after a fire, the building should be restored. The stipulation that there shall be no abatement or reduction of rent is especially persuasive, but without that clause the provision for insurance and the entire Article 5 show unmistakably the intention to restore. And it is equally certain that the landlord's election to repair relieved the tenant of the burden and placed it on the landlord.
The landlord was required to begin the work within a reasonable time and to complete it with reasonable dispatch. Gerzebek v. Lord, 33 N.J.L. 240 (Sup. Ct. 1869). What was reasonable was a question for the jury, to be determined upon a consideration of all the pertinent circumstances. For instance, the circumstance that rent was running, that the tenant was unable (if such was the fact) to continue his business in the premises until rebuilding was completed, or to obtain temporarily other store premises in the neighborhood.
*268 Now, it was a fact that the tenant was in default in the payment of an installment of taxes which he had covenanted to pay on the due date, August 1, 1949; and 11 days after the fire rent for October fell due but was never paid, and neither was the rent for subsequent months. The landlord took the position to which she still clings, that her obligation to restore was suspended while the defaults continued. This view of the matter is not consistent with another position held by the landlord, namely, that the tenant's covenant to pay taxes and rent, and the landlord's implied covenant to restore, were independent of each other. A default in either was not a valid excuse for a failure to perform the other. See cases cited in Annotation in 28 A.L.R. 1453; also Kinney v. Federal Laundry Co., 75 N.J.L. 497 (E. & A. 1907); and Silver Rod Stores, Inc., v. Bernstein, 110 N.J.L. 117 (E. & A. 1933).
The tenant's default in payment of rent and taxes is not a good defense to his claim against the landlord on the covenant to restore, and conversely a breach of the landlord's covenant to restore is not, of itself, a defense to her demand on the covenant to pay rent and taxes. But a breach of the covenant to restore may operate as an eviction. Stewart v. Childs Co., 86 N.J.L. 648 (E. & A. 1914); McCurdy v. Wyckoff, 73 N.J.L. 368 (Sup. Ct. 1906); Weiler v. Pancoast, 71 N.J.L. 414 (Sup. Ct. 1904). The case first cited makes the landlord's intention to deprive the tenant of the enjoyment of the premises an essential element of eviction; but this view of the law must be coupled with a conclusive presumption that the landlord intends the natural consequences of his acts or omissions. Powell v. Merrill, 103 A. 259 (Vt. 1918). By the great weight of authority, there may be a constructive eviction by the landlord's wrongful acts or omissions which deprive the tenant of the beneficial enjoyment of the premises. Shindler v. Grove, etc., Lunch, 184 N.E. 673 (Mass. 1933); McCardell v. Williams, 36 A. 719 (R.I. 1897); Stevens & Co. v. Pratt, 205 Pac. 10; 28 A.L.R. 1445 (Wash. 1922), and annotation at p. 1477; *269 Amsterdam Realty Co. v. Johnson, 161 A. 339 (Conn. 1932); Automobile Supply Co. v. Scene-in-Action, 172 N.E. 35 (Ill. 1930). See generally Williston on Contracts, §§ 891 and 892; 52 C.J.S., Landlord & Tenant, § 455; 32 Am. Jur., Landlord & Tenant, § 246.
Of course, there cannot be a constructive eviction unless the tenant actually vacates the premises. Pabst v. Schwarzstein, 101 N.J.L. 431 (Sup. Ct. 1925); Doyle v. Colasante, 3 N.J. Super. 205 (App. Div. 1949). In the instant case there seems to have been a question whether the tenant quit the premises because the store had become unusable, or whether he only quit after, and because of, the judgment against him entered in the removal proceeding. The issue was for the jury whether the fire, coupled with the wrongful refusal of the landlord to restore the building, impaired the tenant's beneficial enjoyment of the premises so seriously as to justify his vacating the premises, and whether, as a result thereof, he did leave, and when did this occur.
An eviction of a tenant by his landlord is a good defense to a demand for rent that falls due after the eviction. Morris v. Kettle, 57 N.J.L. 218 (Sup. Ct. 1894); Dolton v. Sickel, 66 N.J.L. 492 (Sup. Ct. 1901), affirmed 68 N.J.L. 731 (E. & A. 1903). With the law so settled, there was clearly no error in the denial of the landlord's motion for a directed verdict "for the rent provided for in the lease and the additional rent which the tenant was required to pay, such as taxes, water rents and sewer rents." Counsel stipulated the figures  rent from October 1, 1949, to and including September 1, 1950, $4,200; taxes, etc., $2,047.49, and interest to the day of trial, $387.82. The question of eviction had to be answered by the jury before the landlord could recover. Their verdict for the tenant shows that they found that he had been wrongfully evicted by the landlord.
But there were tax items and municipal charges, $411.89, that fell due August 1 and September 1, 1949, *270 before the day of the fire. As to these, the tenant had no defense, for an eviction does not bar the recovery of rent which is already overdue. Hunter v. Reiley, 43 N.J.L. 480 (Sup. Ct. 1881). And there was probably no question as to the rent that was payable October 1, 1949, $350, for an eviction could hardly be spelled out before that day. Counsel for the landlord did not, however, move separately for a verdict on these items or distinguish in any way between them and the balance of the landlord's demand. Therefore the court's failure to direct a verdict on these items does not raise a question for consideration on the appeal. Yetter v. Gloucester Ferry Co., 76 N.J.L. 249 (Sup. Ct. 1908); Jacob Ruppert v. Jernstedt & Co., 116 N.J.L. 214 (E. & A. 1936).
Upon the appeal, the landlord objects to the following passage from the charge to the jury:
"Now, on the 1st day of February, the plaintiff had judgment of eviction entered in our Camden City District Court against the defendant, which terminated the agreement, terminated the relation of landlord and tenant between the parties. This suit was commenced, the complaint was filed on the 23rd day of January, 1950."
The landlord complains that this, in effect, instructed the jury that the institution of the district court proceeding terminated the defendant's obligation to pay the rent. Clearly, this is not what the charge means, but even if the language could bear that construction, the error would be harmless, since the verdict shows that the jury found that the landlord's failure to restore the building operated as a constructive eviction and so she lost her right to be paid rent.
Let us now consider the motion for a verdict in favor of the landlord on the tenant's counterclaim. Besides suspending the obligation to pay rent, an eviction gives the tenant a cause of action for damages. Slater Realty Corp. v. Meys, 137 N.J.L. 263 (Sup. Ct. 1948). Breach of a covenant to rebuild, though not resulting in an eviction, is of *271 itself ground for the recovery of damages. But the tenant proved no damages caused by eviction or breach of covenant, and abandoned any claim under that head.
The tenant asserts that he is entitled to so much of the insurance money as exceeds what it would have cost to restore the building. The landlord insists that she has a right to retain all of the money.
The lease specifies that all insurance moneys "shall be payable to the landlord as trustee for the uses and purposes herein set forth," and shall be "held as a trust fund for the benefit of the landlord and the tenant." The lease clearly provides that when the tenant does the rebuilding, any balance of the insurance moneys over the cost of the work shall be paid to him. In only two contingencies does the money go to the landlord for her own use  if the tenant defaults in the restoration, or if the lease is terminated because of a default of his. The contract does not specify what will be done with any surplus insurance moneys if the landlord elects to do the rebuilding herself. But note that it was the tenant who paid the insurance premiums. In our opinion, if the landlord actually restores the building, the tenant is entitled to the surplus, and when the landlord first elects and then defaults, the tenant is entitled to whatever sum the jury finds would be the surplus were the work done. Of course, it was also an issue for the jury whether or not the lease was terminated because of the tenant's default.
At the time the lease was executed, the tenant deposited $1,000 to be held by the landlord as collateral security for the rent and for performance by the tenant of all the terms, covenants and conditions of the lease. And the said security shall be held by "the landlord until the termination of this lease, to wit, the 31st day of August, 1956, irrespective of the fact that the said lease may have been terminated prior thereto * * * it being the intention of" the landlord to "hold said sum of money or the balance remaining thereof, as security for any damages that she may sustain during the period up to and including the 31st day of August, 1956."
*272 The tenant demands return of the deposit and the landlord defends on the ground that the demand is premature. The clause of the lease above quoted must be construed to mean that the termination of the lease prior to August 31, 1956, shall not give the tenant a right to an immediate return of the money, if the termination was brought about by his own default. But if the termination was caused by the wrongful act of the landlord and if he has and can later have no claim for rent or damage against which the deposit may properly be applied, then the tenant should be repaid the deposit without awaiting August 31, 1956. In the instant case, the relation of landlord and tenant terminated in the fall of 1949, or the ensuing winter. The landlord could not possibly sustain any loss or damages after he sold the premises, free of the tenancy in September, 1950. If the breach in the relation between the parties was brought about by the wrongful eviction of the tenant, then he could legally demand back the money, but not otherwise.
On both branches of the counterclaim, there were questions of fact for the jury and the landlord's motion was properly denied.
Judgment affirmed.